**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | NO. 08-007 |
| JACOB MITCHELL, | : | |
| *Defendant*. | : | |

<u>**MEMORANDUM**</u>

**JONES, II   J.**                                                                                                    December 7, 2020

**I.       INTRODUCTION**

Since the first cases of an unknown respiratory illness were reported in December 2019,[1] a localized outbreak of coronavirus disease 2019 ("COVID-19") has quickly evolved into a global pandemic,[2] causing a public health emergency of international concern.  The World Health Organization ("WHO") has reported over 62 million confirmed cases of COVID-19 across the six continents, including more than 1.46 million deaths.[3]  In the United States alone, confirmed cases now exceed 13.6 million, and deaths surpass 268,000.[4]  As the spread of the virus continues to grow exponentially, local public health experts in Pennsylvania have raised concerns "about the risk of a coronavirus outbreak among Pennsylvania's incarcerated population."[5]

---

[1] The World Health Organization ("WHO") traces the origin of COVID-19 to a local outbreak in the City of Wuhan, Hubei Province, in Central China.  *See* World Health Organization, *Timeline of WHO's response to COVID-19*, https://www.who.int/news-room/detail/29-06-2020-covidtimeline (last updated June 30, 2020) [hereinafter *WHO's COVID-19 Timeline*] (reporting that the first cluster of COVID-19 cases emerged in December 2019); *see also* discussion *infra* Section II.B.

[2] On March 11, 2020, the WHO characterized the spread of COVID as a pandemic.  *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020; *see also WHO's COVID-19 Timeline*, *supra* note 1.

[3] World Health Organization, *Coronavirus (COVID-19) Dashboard*, https://covid19.who.int/ (last updated Dec. 1, 2020).

[4] *See Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?auth=login-google1tap&login=google1tap (last updated Dec. 1, 2020).

[5] Chris Palmer & Jeremy Roebuck, *What it's like to be locked in prison during the coronavirus pandemic*, PHILA. INQUIRER (last updated Apr. 1, 2020), https://www.inquirer.com/news/coronavirus-covid-19-pennsylvania-prisons-jails-inmates-guards-20200401.html.  *See generally* Pennsylvania Department of Health, *COVID-19 Data for Pennsylvania*, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Coronavirus.aspx (last updated Dec. 4,

In view of the foregoing, Defendant Jacob Mitchell ("Defendant") presently moves for compassionate release from prison for "extraordinary and compelling reasons" under the First Step Act[6] based on his susceptibility to the COVID-19 virus during incarceration. Pending before the Court is Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. §3582(c)(1)(A)(i) (ECF No. 247) [hereinafter Motion]. For the reasons set forth below, Defendant's Motion is denied with leave to re-file.

## II. BACKGROUND

### A. Defendant's Sentencing History

Defendant has been in and out of imprisonment since 1995 when he was eighteen (18) years old. Gov't Response 1. In April 2007, at the age of thirty (30), Defendant was apprehended for selling crack cocaine on the street. *Id*. He was prosecuted in federal court and sentenced by the Honorable James T. Giles to 78 months' imprisonment and four years' supervised release. *Id*. As a result of a retroactive guideline amendment, his term was lowered to 24 moths, and Defendant began his four years of supervised release on December 7, 2009. *Id*. 1-2.

Defendant's current prosecution involves two incidents that occurred in 2012, when he was on supervised release. First, on February 9, 2012, Defendant sold 52.1 grams of crack cocaine to an FBI Informant. *Id*. at 2. Defendant was not arrested at this time. On April 18, 2012, Defendant was heard on a wiretap planning to confront a drug dealer who sold him and an associate bad cocaine. *Id*. Police found Defendant with a loaded 9 mm firearm tucked in his waist and a Glock 9 mm loaded with 32 rounds was with another magazine in the center console. *Id*.

---

2020) (showing that Pennsylvania presently has more than 386,000 confirmed coronavirus cases).
[6] 18 U.S.C. § 3582(c)(1)(A).

Defendant was charged and pleaded guilty to distribution of approximately 52 grams of crack cocaine in violation of 21 U.S.C. §841(a)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §924(c); and possession of a firearm by a felon, in violation of 18 U.S.C. §922(g)(1). In 2016, Defendant was sentenced to 180-months' imprisonment and eight years of supervised release. He was resentenced in 2018 to 120 months' imprisonment and eight years of supervised release. On September 4, 2019, Defendant's supervised release from his previous federal conviction was revoked, and he was sentenced to an additional 18 months' imprisonment. *See* Order that Supervision is Revoked (ECF No. 230). Currently, Defendant has served approximately 116-months of his 138-month sentence, and he is due to be released from FCI Terre Haute on March 3, 2022.[7]

### B.  The COVID-19 Pandemic

According to the United States Centers for Disease Control and Prevention ("CDC"), coronavirus disease 2019 ("COVID-19")[8] is a novel respiratory illness caused by "newly emerged zoonotic coronavirus."[9] COVID-19 seems to spreads easily in the community ("community spread"),[10] by way of "respiratory droplets produced when an infected person coughs, sneezes, or

---

[7] *See* Federal Bureau of Prisons, *Find an inmate*, https://www.bop.gov/inmateloc/ (last visited Dec. 1, 2020).

[8] On February 11, 2020, the International Committee on Taxonomy of Viruses ("ICTV") and the World Health Organization ("WHO") announced the official names of the virus responsible for COVID-19 and the disease it causes. ICTV declared "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)" as the name of the new virus, while WHO revealed "COVID-19" as the name of this new disease. *See* World Health Organization, *Naming the coronavirus disease (COVID-19) and the virus that causes it*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited Dec. 1, 2020).

[9] European Centre for Disease Prevention and Control, *Coronavirus disease 2019 (COVID-19) and supply of substances of human origin in the EU/EEA* (Mar. 20, 2020), https://www.ecdc.europa.eu/sites/default/files/documents/covid-19-supply-substances-human-origin.pdf [hereinafter EU CDC – COVID-19].

[10] "Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected." *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last updated Nov. 24, 2020).

talks."[11]  Given the high infectivity of COVID-19, "[a] simple sneeze or brush of the face without washing your hands is now known to easily spread the virus, which generally causes fever, cough, and shortness of breath."[12]  Currently, several vaccines have shown positive results to prevent COVID-19, though their approval is pending.[13]

In the initial absence of such solutions, governments have turned to non-medical interventions to try to slow the spread of the disease, including: school closures, restrictions on businesses and large gatherings, stay-at-home orders, and "social distancing" policies.  *United States v. Ortiz*, No. 1:18-CR-00134, 2020 WL 1904478 (M.D. Pa. April 17, 2020) (citing *Social Distancing, Quarantine, and Isolation*, CENTERS FOR DISEASE AND CONTROL PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html).

In line with those policies, the Commonwealth of Pennsylvania issued a mandatory stay-at-home order for all individuals in the Commonwealth and has previously closed all schools, among other measures to combat the disease.[14]  Public health experts "now acknowledge that there is little that can be done to stop the spread of COVID-19 absent effective quarantine and social distancing procedures."[15]

"Although most people who become sick from COVID-19 develop only mild or moderate respiratory symptoms and recover with no medical intervention, a minority of cases lead to serious illness that can result in hospitalization or death."  *United States v. Ortiz*, 1:18-CR-00134, 2020

---

[11] *See id.*; *see e.g.*, EU CDC – COVID-19, *supra* note 10 (specifying that the virus is transmitted from human to human via droplets coughed or exhaled by infected persons and by touching droplet-contaminated surfaces or objects and then touching the eyes, nose, or mouth").

[12] *Id.* (citing Centers for Disease Control and Prevention, *How Coronavirus Spreads*).

[13] *Different COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html (last updated Nov. 24, 2020).

[14] *See* Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home (Apr. 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[15] *Bharatkumar G. Thakker v. Clair Doll*, 1:20-CV-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020).

WL 1904478, at *2. While much remains unknown about COVID-19, available data by the CDC identifies certain groups of individuals who are at a "higher risk for severe illness from COVID-19"—most notably "older adults and people of any age who have serious underlying medical conditions."[16] In addition, the CDC has warned that incarcerated individuals also face the risk of potentially fatal exposure to COVID-19[17] because "[m]any of the recommended measures to prevent infection are impossible or unfeasible in prison." *United States v. Pabon*, No. 17-165-1, 2020 WL 2112265, at * 5 (E.D. Pa. May 4, 2020).

> i. COVID-19 in Correctional and Detention Facilities

"Correctional and detention facilities 'present unique challenges for control of COVID-19 transmission among incarcerated/detained persons and staff. According to public health experts, incarcerated individuals 'are at special risk of infection, given their living situations' and 'may also be less able to participate in proactive measures to keep themselves safe;' 'infection control is challenging in these settings.'" *United States v. Wilson*, No. 14-209-1, 2020 WL 1975082, at *2 (E.D. Pa. Apr. 24, 2020).

Recognizing that "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced," the CDC issued guidance on how to control the risk of contagion in prisons and detention environments on March 23, 2020 and released more up-to-date suggestions as recent as December 3, 2020. *See* Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*,

---

[16] *Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last updated Sept. 11, 2020).

[17] "The risk from COVID-19 to Americans can be broken down into risk of exposure versus risk of serious illness and death."

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Dec. 3, 2020).  The updates include guidance on how to: release individuals with confirmed COVID-19 cases into medical isolation, perform broad-based testing, define close contact, and update quarantining and contact-tracing procedures.  *Id*.  Since the outbreak of the pandemic, the BOP "has implemented a number of protocols to protect the inmate population and staff from COVID-19."  *United States v. Stevens*, No. 19-359-02, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 16, 2020).

### Procedural History

On September 21, 2020, Defendant filed the instant Motion to Reduce Sentence Pursuant to 18 U.S.C. §3582(c)(1)(A)(i) (ECF No. 247), requesting compassionate release from FCI Terre Haute on the grounds that his underlying and pre-existing health conditions place him at high risk for complications arising from potential infection with COVID-19 while incarcerated. The Government submitted a response in opposition to Defendant's Motion on November 9, 2020 (ECF No. 250).  Defendant's Motion is thus ripe for the Court's review.

### III.    LEGAL STANDARD

Pursuant to 18 U.S.C. § 3582(b), a judgment of conviction that includes a sentence of imprisonment "constitutes a final judgment and may not be modified by a district court except in limited circumstances." *See Dillon v. United States*, 560 U.S. 817, 824 (2010) (internal quotations omitted); *In re Morris*, 345 F. App'x 796, 797-98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)) (declaring that a court may not modify a term of imprisonment except in enumerated cases).  One limited exception is 18 U.S.C. § 3582(c)(1)(A), which provides for what is commonly referred to as "compassionate release."

On December 21, 2018, the First Step Act ("FSA")[18] amended 18 U.S.C. § 3582(c)(1)(A) to add a provision that allows a defendant to move to a district court for a reduction in sentence, *i.e.* petition the court for compassionate release,[19] after exhausting the BOP's administrative process. Under 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court may reduce an inmate's term of imprisonment only if the following four conditions are met: (1) "the inmate must satisfy an administrative exhaustion requirement;" (2) "the Court must find that 'extraordinary and compelling reasons warrant such a reduction;'" (3) "any reduction granted by the Court must be 'consistent with any applicable policy statements issued by the Sentencing Commission;'" and (4) "the proposed reduction must be consistent with the sentencing factors outlined in 18 U.S.C. §3553(a)." *United States v. Brown*, 13-CR-176-05, 2020 WL 2615616, at * 1 (E.D. Pa. May 22, 2020).

## IV.   DISCUSSION

In his Motion, Defendant broadly describes the dangers of COVID-19, the increased risks of COVID-19 transmission in detention facilities, and how he has a high risk for serious infection if he were to contract COVID-19 because of his Crohn's Disease. Defendant moves the Court to modify his prison sentence to time served for "extraordinary and compelling reasons" pursuant to the First Step Act ("FSA"), 18 U.S.C. § 3582(c)(1)(A)(i), due to his susceptibility to COVID-19. Accordingly, the Court considers the following: (1) whether "extraordinary and compelling reasons" exist to reduce Defendant's sentence based on the enumerated criteria in the policy statement and an independent assessment; and (2) whether Defendant is a danger to the community

---

[18] First Step Act, PL 115-391, 132 Stat 5194 (Dec. 21, 2018).
[19] 18 U.S.C. § 3582(c)(1)(A) "defines the mandatory conditions precedent to a defendant filing a motion for compassionate release." The Court notes the Sentencing Guidelines have not been updated to reflect the First Step Act, which provides that incarcerated defendants may file motions for compassionate release for disposition by the court. Pub. L. 115-391, §§ 603(b)(1), 132 Stat. 5194, 5239. Previously, such motions could be filed only by the Director of the BOP. U.S.S.G. § 1B1.13.

under § 3142(g), and the § 3553(a) factors support a sentence reduction. *United States v. Pabon*, 17-CR-165-1, 2020 WL 2112265, at *2 (E.D. Pa. May 4, 2020).

### A. Exhaustion of Administrative Remedies

Before a defendant can proceed to the merits of a motion for compassionate release, the defendant must satisfy Section 3582(c)(1)(A)'s exhaustion requirement.[20] *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). To accomplish this, the First Step Act furnishes prisons with "two direct routes to court: [either] (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion [for compassionate release], or (2) file a motion 'after the lapse of 30 days from the receipt . . . of such a request' by the warden of the prisoner's facility, 'whichever is earlier.'" *Wilson*, 2020 WL 1975082, at * 2 (E.D. Pa. Apr. 24, 2020) (quoting *United States v. Rodriguez*, No. 03-271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Raia*, 954 F.3d at 595. Under the exhaustion requirement, the BOP is given "a chance to review a defendant's request in the first instance[, which] can result in the request being 'resolved much more quickly and economically . . . than in litigation in federal court.'" *Woodford v. Ngo.*, 548 U.S. 81, 89 (2006). Moreover, it permits the BOP "to gather the defendant's administrative and medical records, helping to 'produce a useful . . . record for subsequent judicial consideration.'" *Id.*

Although courts are split on whether the failure to satisfy 18 U.S.C. § 3582(c)(1)(A)'s filing requirements bars defendants from filing motions for compassionate release, the Third Circuit has determined that an inmate may file a motion for compassionate release in a United States District Court thirty (30) days after presenting the request to the warden, regardless of

---

[20] Section 3582(c)(1)(A) prohibits a defendant from moving for compassionate release, and the court from acting on that motion, until after the defendant has satisfied the statute's exhaustion requirement. Prior to the First Step Act, a motion for compassionate release could be brought by only the director of the BOP, not the defendant. *See* 18 U.S.C. § 3582(c)(1)(A) (2017).

whether the administrative appeal process is complete. *See United States v. Harris*, 973 F.3d 170 (3d Cir. 2020). In the present case, Defendant submitted a compassionate release request with the Warden on April 20, 2020. Mot. 7. His Motion is thus ripe for consideration.

### B. Extraordinary and Compelling Reasons

Given that Defendant has met the administrative remedy exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A), Defendant's "next hurdle is to establish that 'extraordinary and compelling reasons' warrant a reduction of his sentence." *United States v. Cantatore*, 16-CR-0189, 2020 WL 2611536, at *3 (N.D.J. May 21, 2020).

"Section 3582(c)(A)(1) does not define what constitutes 'extraordinary and compelling reasons.' Instead, Congress delegated authority to the Sentencing Commission to 'describe what should be considered extraordinary and compelling reasons for sentence reduction.'" *United States v. Hammond*, No. 18-CR-184, 2020 WL 2126782, at *4 (E.D. Pa. May 5, 2020).[21]

---

[21] The Commission provided its definition of the term "extraordinary and compelling reasons" in U.S.S.G. § 1B1.13, Application Note 1, which provides, in its entirety:
> 1. Extraordinary and Compelling Reasons – Provided the defendant meets the requirements of subdivision (2) [*i.e., danger to the community*], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>> (A) Medical Condition of the Defendant. –
>>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>> (ii) The defendant is –
>>>> (I) suffering from a serious physical or medical condition,
>>>> (II) suffering from a serious functional or cognitive impairment, or
>>>> (III) experiencing deteriorating physical or mental health because of the aging process that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>> (B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious health deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>> (C) Family Circumstances
>>> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>>> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse

Here, Defendant alleges his Crohn's Disease and the necessary Remicade infusions that weaken his immune system combined with concerns over possible exposure to COVID-19 constitute an extraordinary and compelling reason to reduce his sentence. The Court disagrees.

To be clear, the severity of the COVID-19 pandemic cannot be discounted, and the Court empathizes with Defendant's health concerns. However, the Third Circuit has made apparent, "[t]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). "Thus, the Court must conduct a highly individualized inquiry of this Defendant to determine whether COVID-19 in conjunction with [his] alleged underlying medical conditions constitute extraordinary and compelling reasons for a reduction of [his] sentence to time served." *Cantatore,* 2020 WL 2611536, at *3.

As of December 1, 2020, the CDC updated the list of conditions by which "adults of any age with the following conditions *might* be at an increased risk for severe illness from the virus that causes COVID-19." (emphasis added).[22] Of those conditions, Defendant only suggests an immunocompromised state from immune weakening medicines is applicable to him.

Even though Defendant might be at an increased risk of severe illness, he fails to show how the care he receives from FCI Terre Haute has been inadequate. For individuals with weakened immune systems from medications, the CDC recommends they: continue taking any

---

or registered partner.
    (D) Other Reasons – As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reasons other than, or in combination with, the reasons described in the subdivisions (A) through (C).

[22] Centers for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 1, 2020).

recommended medication or treatment; not stop taking medicines without first talking to their healthcare provider; have at least a 30-day supply of medicines; not delay life-saving treatment or emergency; and call their healthcare providers with any concerns about their condition or if they feel sick.[23]  Defendant's most recent visit with the BOP Health Clinic was on September 21, 2020.  Medical Records 2020 Updated, attached as Exhibit C to Gov't Sealed Exhs. [hereinafter, Exh. C], 1-3.  Despite being told to "[f]ollow up as needed," Defendant never returned for further treatment.  The BOP Health Clinic assures Defendant receives the necessary Remicade infusions, and he is taken offsite every eight weeks to receive proper care.  *Id*. at 15.

Though Defendant has frequented the BOP Health Clinic, he has yet to raise any concerns about his medication and or the side effects of weakening his immune system during the pandemic.  Considering his current medical record, Defendant fails to show how the BOP Health Clinic cannot provide adequate care for his Crohn's Disease (a condition not listed by the CDC as a comorbidity with COVID-19) or how incarceration has prevented Defendant from following the CDC's recommendations for individuals with weakened immune systems from medication.

With regards to Defendant's more generalized concerns over COVID-19 while incarcerated, the health of inmates is of the utmost concern to BOP, and they have made many strides to protect the safety of both inmates and staff during these unprecedented times.  Updated on November 25, 2020, the BOP has enacted protocols such as: issuing face masks to all staff and inmates, frequently screening and testing both inmates and staff, encouraging social distancing, strengthening cleaning protocols, requiring no-contact visits, and limiting social gatherings in all facilities. [24]  Further, inmates who are symptomatic and/or test positive for

---

[23] *See People with Certain Medical Conditions*, supra n. 22.
[24] Federal Bureau of Prisons, *BOP Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last

COVID are placed in medical isolation, and those who are asymptomatic but have a risk of exposure are placed in quarantine.[25]

Defendant currently resides at FCI Terre Haute. As of the date of this writing, out of the total 1,080 inmates, FCI Terre Haute has 148 reported COVID-19 positive inmates and 20 reported positive staff.[26] There has been one reported death from COVID-19 amongst both staff and inmates, and there have been 205 recovered COVID-19 cases in this facility.[27] Even though a defendant may face a greater risk of contracting COVID-19 at a particular prison location, the increasing cases arising daily outside of the prison must be considered and offset this concern. *Thornton*, 2020 WL 4368155, at *4. *See United States v. Brinson*, No. 15-85, 2020 WL 4736258, at *3 (W.D. Pa. Aug. 25, 2020) (finding the mere existence of COVID-19 insufficient to establish extraordinary and compelling circumstances without some proof that the defendant is at a more severe risk than his fellow inmates).

Especially when considering the rising number of COVID-19 cases outside of prison, Defendant's desires to resume normal life if released from custody could be equally threatening to his medical conditions. Defendant notes he "has promised employment with Waste Management awaiting him upon release." Mot. 13. Because Defendant does not suggest this to be a remote-working position, this proves contrary to Defendant's concerns of potential exposure to COVID-19.

The Court is aware of the dangers posed by COVID-19 and understands Defendant's health risk due to his weakened immune system, but these must be considered in light of BOP's efforts to combat and contain the virus. Without reason to believe the BOP's response has been

---

updated Nov. 25, 2020).
[25] *Id*.
[26] Federal Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last updated Dec. 1, 2020).
[27] *Id*.

inadequate or that Defendant has received insufficient healthcare, he has failed to demonstrate any extraordinary and compelling reasons warranting early release from incarceration under 18 U.S.C. § 2385(c)(1)(A) and U.S.S.G. § 1B1.13.

**Section 3553(a) Factors and Dangerousness to Community**

Even if this Court found the Defendant's medical condition and the presence of COVID-19, rose to a level of extraordinary and compelling reasons, those considerations would be outweighed by the §3553(a) factors and that Defendant presents a danger to the community.

Prior to modifying a term of imprisonment under Section § 3582(C)(1), a court must also consider Section § 3553(a)'s factors "and establish that the defendant is not a danger to the safety of any person in the community as provided in 18 U.S.C. § 3142(g)." *Cantatore*, 2020 WL 2611536, at *5. The factors include:

> (1) the nature of the circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and,
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
> (3) the kinds of sentences available;

. . .

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty in similar conduct[.]

18 U.S.C. § 3553(a).

The Government suggests a sentence reduction is not appropriate due to Defendant's "history of violence and drug trafficking." Gov't Response 16. Considering the totality of these factors, the Court finds the same.

Defendant is a career offender who has been in and out of imprisonment since his teenage years. The present prosecution involved purchasing bad cocaine and setting out with loaded

firearms to get revenge on the cocaine dealer. Gov't Response 16. Undoubtedly, this conduct involved activities that were highly dangerous to the community. Defendant claims that because he still has years of supervised release for his sentence, "[t]his supervision will ensure the safety of the public and community at large." Mot. 13. However, the Court is not persuaded by the downplayed seriousness of his actions when Defendant's current prosecution arose while he was also on supervised release for a prior offense.

Defendant further suggests he is no longer a threat to public safety because he has been consistently employed during his time of incarceration, participated in numerous education programs, and has not had a disciplinary infraction since January 2014. Mot. 13. While the Court commends Defendant's efforts toward rehabilitation, this Court cannot ignore his extensive, violent criminal history. See *U.S. v. Baye*, No. 12-115, 2020 WL 2857500, at *10 (D. Nev. June 2, 2020) (Denying compassionate release for a model inmate because "[d]efendant has a significant number of convictions, including several for violent felonies. And despite numerous crimes and sentences, [he] has always quickly recidivated, committing further dangerous crimes."). Considering this criminal history, cutting Defendant's 180-month sentence nearly 22 months early would promote disparity in sentencing and "would certainly fail to reflect the seriousness of [his] violations." *Brown*, 2020 WL 2466081, at *4.

Courts in this District have similarly denied compassionate release in cases comparable to this. See *U.S. v. Goode*, No. 10-177-02, 2020 WL 6445930, at *7 (E.D. Pa. Nov. 2, 2020) (denying compassionate release where a career offender pleaded guilty to drug trafficking charges and still had five years remaining on his sentence); *U.S. v. Phillips*, No. 09-718, 2020 WL 5076753, at *5 (E.D. Pa. Aug. 27, 2020) ("The violent gun crime for which [the defendant] is currently serving was committed while he was still on parole for one of his drug convictions. [His] criminal history

reveals a tendency towards recidivism and violence and...a 'flagrant disregard for the law.'" (citation omitted)); *Thornton*, 2020 WL 4368155, at *5 (concluding that compassionate release would be inappropriate for an offender whose current drug conviction arose while defendant was on supervised release for a federal firearm conviction).

Granting Defendant compassionate release at this stage would not reflect the seriousness of his crimes, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from future crimes, or prevent sentence disparities.

Finally, this Court must consider the danger Defendant could present to the community. To do this, courts turn to the factors set forth in §3142(g), which include the nature and circumstances of the crime charged; the defendant's personal history; and the defendant's criminal history. 18 U.S.C. §3142 (g). Considering all the factors previously stated, the Court cannot confidently say that releasing Defendant at this early stage would not bring greater danger to the community.

**CONCLUSION**

The Court concludes that Defendant has not demonstrated extraordinary and compelling reasons justifying his release under 18 U.S.C. § 3582(c)(1)(A) and § 1B1.13 of the Sentencing Guidelines at this time. For the foregoing reasons, Defendant's Motion for Compassionate Release is denied with leave to re-file. An Order consistent with this Memorandum follows separately.

BY THE COURT:

*/s/ C. Darnell Jones, II*
C. DARNELL JONES, II      J.